**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| JULIA RINGERING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13-cv-3024 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant, | ) | |

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Julia Ringering appeals from the denial of her application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) .  Ringering filed a Motion for Summary Reversal (d/e 14), and Defendant Commissioner of Social Security filed a Motion for Summary Affirmance (d/e 18).  This matter has been referred for a Report and Recommendation.  Text Order entered May 29, 2014.  For the reasons set forth below, the decision of the Commissioner should be affirmed.

Ringering was born on January 1, 1970.  Ringering completed high
school.  She worked in various clerical, administrative, and sales positions
at automobile dealerships.  She also worked as a cashier and in the paint
department at a Wal-Mart.  She last worked on December 26, 2007.
Answer (d/e 8), attached Certified Transcript of the Record of Proceedings
before the Social Security Administration (R.) 48, 57.  Ringering suffers
from degenerative disc disease, bipolar disorder, posttraumatic stress
disorder (PTSD), and alcohol abuse.  R. 29.  Ringering filed her application
for Disability Benefits on October 6, 2009.  She alleged that she became
disabled on December 26, 2007.  Ringering worked sufficient quarters to
remain insured for Disability Benefits through March 31, 2009.  R. 27.

Ringering is married.  She testified at the March 3, 2011, hearing that
she lived with her husband, the couples' 12 year-old twin sons, and their 10
year-old daughter.  Her husband's 17 year-old daughter visited the home a
couple of times a week.  Her husband's 21 year-old daughter was in
Afghanistan at the time of the hearing.  R. 4-45.

On April 23, 2007, Ringering saw psychiatrist Dr. Sanjay K. Nigam,
M.D., for a psychiatric evaluation.  Ringering reported nightmares,
flashbacks, depression, thoughts of suicide and hypersomnia.  Ringering

reported that she blamed herself for the suicide of her fiancé in April 1995.
She reported that she began to seek psychiatric treatment in 1997. She
reported episodes of depression in which she experienced increased sleep,
low energy, feelings of guilt, poor concentration, weight gain, psychomotor
retardation, and lack of motivation. She also reported suicidal ideations.
She reported having panic and anxiety attacks. She admitted having three
panic attacks on the day of the evaluation. Dr. Nigam diagnosed bipolar
disorder, possibly cyclothymia. He assigned her a Global Assessment of
Functioning (GAF) score of 55.[1] Dr. Nigam changed Ringering's
medications. R. 199-201.

Ringering continued to see Dr. Nigam throughout 2007 and into 2008.
On May 9, 2007, and May 21, 2007, Ringering complained to Dr. Nigam of
difficulty sleeping and not being motivated to clean the house. R. 202-03.
On May 9, 2007, Dr. Nigam noted that Ringering's thought process was
logical and goal oriented and her judgment and insight were good. R. 202.
On May 21, 2007, Dr. Nigam again noted that Ringering's judgment and
insight were good. R. 203.

---

[1] The GAF score was a measure of a clinician's judgment of an individual's overall level of functioning on a hypothetical continuum of mental health and illness. American Psychiatric Assn, Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Rev.) at 32-35. The American Psychiatric Association no longer recommends use of the GAF score. Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013), at 16.

On August 8, 2007, Ringering reported racing thoughts. Dr. Nigam noted that her thought process was logical and goal oriented and her judgment and insight were good. Dr. Nigam recommended counseling. R. 205.

On September 5, 2007, Ringering again reported racing thoughts. Dr. Nigam noted that she had a depressed mood, coherent speech, logical thought processes, normal memory, good judgment and fair insight. R. 206. Dr. Nigam again adjusted her medications.

On October 8, 2007, Ringering reported that she stopped drinking. She reported that she was sleeping better, but still experienced drowsiness. Dr. Nigam noted that her speech was coherent, her thought process was logical, her memory was normal, her insight was fair, and her judgment was good. R. 207.

On January 4, 2008, Ringering saw Dr. Nigam. Ringering reported that the holidays were not good for her. She reported that she had stress at work at Wal-Mart, and she quit. She reported that she was drinking and was not taking her medications. Dr. Nigam and Ringering discussed the adverse interaction between alcohol and her medications and the effect on her mental illness. Dr. Nigam noted that she was alert and calm, she had a

sad mood, her thought process was concrete, her judgment and insight were poor, and her ability to abstract was limited.  R. 208.

On January 4, 2008, Dr. Nigam wrote a letter To Whom It May Concern regarding Ringering.  Dr. Nigam wrote that Ringering was suffering from bipolar disorder with episodes of manic and depressive symptoms.  He stated that she required extra support from her family during these episodes.  R. 211.

On February 4, 2008, Ringering saw Dr. Nigam.  Ringering reported getting arrested for DUI and resisting arrest.   Her driver's license was suspended.  She reported that the officer shocked her with a Taser. Dr. Nigam stated on that date that Ringering had a good appearance and an improved mood; her cognition was within normal limits; and she had good judgment, fair insight, normal affect, and a logical and goal directed thought process."  Dr. Nigam assigned GAF score of 50 at this visit. R. 209.

On February 26, 2008, Ringering saw an orthopedic surgeon, Dr. Lukasz Curylo, M.D. because of problems with her neck.  On examination, Dr. Curylo found limited range of motion in her neck and decreased strength and sensation in her left arm and fingers.  An MRI showed two large disc herniations at C5-6 and C6-7.  The herniations

caused neuro-compression and significant canal narrowing.  Dr. Curylo discussed treatment options with Ringering, including possible surgery. R. 375.  Ringering decided to have surgery on her neck.  On or about March 4, 2008, Dr. Curylo performed a cervical fusion operation in which he fused C5-C7 vertebrae.  R. 370.[2]  Ringering wore a cervical collar after the operation.

On March 24, 2008, Ringering saw Dr. Curylo for a postoperative follow-up examination.  Dr. Curylo stated that Ringering was healing well. Dr. Curylo refilled her pain medication prescriptions.  R. 370.

On March 31, 2008, Ringering saw Dr. Nigam.  She reported neck pain.  She reported trouble sleeping and having racing thoughts. Dr. Nigam noted that Ringering had a better mood, a normal affect, and a logical goal directed, and sequential thought process."  R. 210.  Dr. Nigam also stated Ringering had fair judgment and insight.  R. 210.

On May 12, 2008, Ringering saw Dr. Curylo for a second follow-up examination after her surgery.  Ringering reported much less pain.  She reported that she was taking no pain medication.  She complained of mild occasional numbness in her left thumb and first and second fingers.  Her symptoms were intermittent.  On examination, Dr. Curylo found that the

---

[2] Dr. Curylo's notes for the March 24, 2008 follow-up examination state that Ringering was three weeks postoperative on that date.  Dr. Sohn's notes state that the surgery was on March 4, 2008.  R. 367.

incision was well-healed.  He noted no pain in range of motion.  Dr. Curylo told Ringering that she no longer needed to wear the cervical collar. Dr. Curylo refilled Ringering's pain prescriptions.  R. 371-72.

On May 22, 2008, Ringering saw a psychiatrist Dr. Kapal Datta, M.D., for a psychiatric evaluation.  Dr. Datta's notes in the record are handwritten and very difficult to read.  The parties and the Court have been able to identify some statements from these writings.  On May 22, 2008, Ringering rated her depression as a "7 out of 10."  She reported that her anxiety varied.  Dr. Datta adjusted her medications.  R. 213-17.

Ringering saw Dr. Datta several times from May through October 2008.  In September 2008, Ringering reported that she and her husband filed for bankruptcy relief.  In October 2008, Ringering reported that she could not hold a job.  Ringering stated that she had been sober since January 2008.  R. 218-225, 228-229.

Dr. Shazia Malik, M.D., wrote a letter To Whom It May Concern dated November 4, 2008, stating that Ringering completed 21 hours of a dual diagnoses program for her mental problems and her problems with substance abuse.  R. 292.

On November 17, 2008, Ringering saw Dr. Curylo about her neck. Ringering reported increasing axial neck pain.  She also reported

suboccipital pain and intermittent numbness in her left hand. Ringering denied any weakness. Dr. Curylo stated that Ringering may have had adjacent level degeneration with cervicalgia and possibly facet disease superior to the location of her March 2008 fusion. Dr. Curylo referred Ringering to a pain specialist. R. 369.

On December 8, 2008, Ringering saw Dr. Datta. Dr. Datta noted that Ringering's affect was ok, her mood was much better, and she was sleeping better. R. 234-35. On December 29, 2008, Ringering saw Dr. Datta again. Ringering reported having better energy. Ringering reported that her Christmas was "great." R. 236-37.

On January 26, 2009, Ringering saw a pain specialist, Dr. Daniel Sohn, M.D. Dr. Sohn noted neck and shoulder girdle myofascial pain. Dr. Sohn prescribed physical therapy and medication. Dr. Sohn mentioned that trigger point injections would be considered in the future. Dr. Sohn advised Ringering to remain active with her usual activities. Dr. Sohn advised against bed rest. R. 367-68. Dr. Sohn recommended continuing "appropriate exercises as discussed." R. 368.

Ringering continued to see Dr. Datta in 2008 and 2009. R. 213-50. On March 30, 2009, Ringering reported that therapy was helpful. Ringering reported problems at home because of the bankruptcy. She

reported negative self-esteem, but she also reported that the medications helped, she was having no anxiety attacks, her eating and sleeping habits were better, and she was cleaning house and visiting friends. R. 240-41. On May 18, 2009, Ringering reported having lots of anxiety attacks. Ringering reported fighting and anger. R. 242. Dr. Datta listed Ringering's diagnosis as bipolar affective disorder and an adjustment disorder (mixed). Dr. Datta indicated that Ringering was doing much better, and her mood was better. R. 244.

On April 21, 2009, Ringering saw Dr. Sohn. Ringering reported that the physical therapy hurt. Ringering reported that she continued to follow through on a home exercise program. On examination, Ringering was alert, and in a stable mood. Ringering's head and neck appeared normal. Her range of motion in her neck was decreased in left rotation and extension. She was tender to palpitation on the left neck and shoulder. Her upper extremity strength was intact, but she had some pain in her left shoulder girdle with manual muscle testing. Dr. Sohn gave Ringering three trigger point injections. Dr. Sohn also renewed her medications and directed her to continue her exercises. Dr. Sohn again advised Ringering to remain active, avoid bed rest, and continue appropriate exercises. R. 362-63.

On May 19, 2009, Ringering saw Dr. Sohn again.  On examination, her condition was substantially the same as when she saw Dr. Sohn in April 2009.  Dr. Sohn administered one trigger point injection.  He added valium to her medications, to be taken at night.  He again advised her to remain active; he advised against bed rest; and he recommended appropriate exercises that they had discussed.  R. 359-60.

On June 23, 2009, Ringering saw Dr. Sohn.  Ringering reported that two family trips to Florida and Texas caused some tiredness.  She reported that the trigger injections had been helpful.  She reported that her pain was much better on the left.  She reported more pain on the right at this visit.  She stated the pain in the right side may have been due to her trips.  On examination, her range of motion in her neck appeared to be good.  She was tender to palpitation.  Her upper extremity strength was intact, but her upper extremity sensation was decreased.  Dr. Sohn renewed her medications.  He advised her to remain active; he advised against bed rest; and he advised to continue her medications and exercises.  R. 357.

On August 17, 2009, Ringering saw Dr. Sohn.  Dr. Sohn administered five trigger injections.  Dr. Sohn ordered a nerve conduction study of her left extremity.  R. 351-52.  On September 11, 2009, Ringering saw

Dr. Sohn again.  Dr. Sohn reported that the nerve conduction study showed normal nerve conduction with some borderline measurements.  R. 351. Dr. Sohn ordered an MRI of Ringering's cervical spine.  The MRI was conducted on November 17, 2009.  The results showed minimal disk bulging of the upper cervical segments without obvious stenosis or cord compression.  The results also showed a congenitally narrow spinal canal. R. 378.

On September 18, 2009, Ringering was admitted to an intensive psychiatric outpatient program.  Dr. Datta referred her to the program because of his concerns about her manic symptoms and her cravings to drink and engage in promiscuity.  Ringering was assessed with low mood, feelings of helplessness, hopelessness, somatic complaints, decreased sleep, decreased appetite, excessive worry, racing thoughts, difficulty concentrating, poor impulse control, irritability, and outbursts of anger.  She reported some suicidal ideations.  R. 309.

On September 20, 2009, Ringering was examined by psychiatrist Dr. Shazia Malik, M.D.  On examination, Ringering was alert and oriented. Her speech was coherent.  Her thought process was logical and goal oriented.  Her remote memory was grossly intact.  Her intellect was

average.  Her concentration was fair.  Dr. Malik diagnosed bipolar affective disorder, depressed, and alcohol dependence in partial remission. Dr. Malik assigned a GAF score of 55.  R. 311-12.  Dr. Malik planned to continue the intensive outpatient program, recommended AA meetings, and adjusted her medications.  R. 313

On September 30, 2009, Ringering was hospitalized after reporting suicidal ideations, anxiety, and anger.  R. 314-17.  She was discharged from inpatient care on October 9, 2009.  At the time of discharge, Ringering reported some continuing depression, anxiety, and anger, but denied any suicidal ideations.  Ringering was assessed with a major depressive disorder and alcohol abuse in initial remission.  She was given a GAF score of 60.  R. 314-17.

Ringering apparently returned to the intensive outpatient program until November 5, 2009.  R. 309.  At the time of discharge, Ringering was stable without any suicidal or homicidal ideations.  She was assigned a GAF score of 65.  R. 310.[3]

On November 23, 2009, Ringering saw Dr. Sohn.  Dr. Sohn administered an epidural steroid injection into the cervical spine.  Ringering underwent a C4-5 Transforaminal Epidural Steroid Injection (TFESI) on

---

[3] The "To Whom It May Concern" letter written by Dr. Malik dated November 4, 2008, may actually relate to this intensive outpatient program.  The November 4, 2008 date may be erroneous. This is the only outpatient program in the records and Dr. Malik was the psychiatrist overseeing the program.

November 3, 2009. Ringering reported about a 50% improvement in her pain, but she still had pain in her neck and left shoulder girdle area. Ringering still took 4 to 5 Percocet per day. On examination, Ringering's range of motion was very decreased. Her upper extremity strength was intact. Her left trapezius was very tender to palpitation. She reported tingling in three of her left fingers, but her sensation to light touch was intact in those fingers. Dr. Sohn administered a trigger point injection and ordered another C4-5 TFESI. R. 347.

On January 12, 2010, Ringering saw Dr. Sohn. Ringering reported that the C4-5 TFESI temporarily caused increased pain, but her pain had dropped from 6/10 to 3-4/10. She reported muscle spasms in her left shoulder girdle muscle that responded well to her medications. On examination, her range of motion in her neck was decreased to the left. Her upper extremity strength was intact. Her left shoulder active range of motion was good, but with some pain. Her upper extremity sensation was decreased on the left in a C6 distribution. Dr. Sohn prescribed medications and told her to return in two months. R. 341-42.

On February 21, 2010, state agency psychologist, Dr. S. Hill, Ph.D., completed a Psychiatric Review Technique. R. 254-67. Dr. Hill opined that Ringering's affective disorders and anxiety related disorders were not

severe.  R. 254.  Dr. Hill opined that Ringering had depression.  R. 259.

Dr. Hill opined that Ringering had mild difficulties maintaining

concentration, persistence or pace, but no other functional limitations as a

result of her mental condition.  R. 264.  Dr. Hill noted at the end of the

Technique,

> Claimant stable at exam of 3/30/09.
> Improvements noted
> Claimant's allegations, credible.
> Impairment not severe.

R. 266.

On March 4, 2010, Dr. Datta completed a form entitled Social

Security Administration Listing of Impairments.  R. 269-71.  Dr. Datta

opined that Ringering became disabled prior to 2008.  Dr. Datta opined that

Ringering had ongoing symptoms of psychomotor agitation or retardation.

Dr. Datta opined that Ringering's condition resulted in marked difficulties

maintaining social functioning, and marked difficulties maintaining

concentration, persistence, or pace; and repeated episodes of

decompensation, each of extended duration.  R. 270.  Dr. Datta indicated

that Ringering had one or two episodes of decompensation.  R. 271.

Dr. Datta checked a box indicating that Ringering's condition met the

Social Security Administration's Listing § 12.04 for Affective Disorders.

R. 270.   The Social Security Administration's analysis of disability considers, at one point, whether a person is so significantly impaired he would be deemed disabled without regard to his age, education, or work experience.   20 C.F.R. §§ 404.1520(d), 416.920(d).   To meet this requirement, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 Listing of Impairments.   Each impairment identified in the Listing of Impairments is referred to as a "Listing."   Section 12.04 sets forth the Listing for affective disorders such as depression and bipolar disorder.

On April 23, 2010, a psychologist, Dr. M.W. DiFonso, Psy.D., completed a Psychiatric Review Technique.   R. 275-88.   Dr. DiFonso opined that Ringering had a history of major depressive disorder.   R. 278. Dr. DiFonso opined that there was insufficient evidence in the record to establish any functional limitations from Ringering's mental condition. R. 285.   Dr. DiFonso opined that Ringering's statements were only partially credible.   Dr. DiFonso opined that Dr. Datta's opinions on the Social Security Administration Listing of Impairments form, R. 269-71, were inconsistent with his treatment notes and not otherwise supported by the record.   R. 287.   Dr. DiFonso stated that, "No objective findings are presented to substantiate this claim."   R. 287.

On April 28, 2010, substance abuse counselor Jill Wright from the Montgomery County, Illinois, Health Department conducted a drug/alcohol assessment of Ringering. Wright concluded that Ringering did not present sufficient evidence of current substance abuse to warrant treatment. R. 294.

On July 15, 2010, Ringering saw Dr. Sohn. Ringering reported increased neck pain and headaches. Ringering reported that she had been moving and doing a lot of cleaning, scraping, and painting at the new house. On examination, Ringering's range of motion was fair with pain in the neck and shoulder girdle. Ringering was tender to palpitation on the left shoulder girdle. Her left upper extremity strength was intact. Dr. Sohn diagnosed a flare-up due to increased activities. Dr. Sohn prescribed Vicodin. R. 333.

On December 2, 2010, Ringering saw Dr. Sohn. Ringering complained of left neck, shoulder, and arm pain with some residual numbness in the first and second fingers of the left hand. An MRI performed in September 2010 showed the C5-C7 fusion with stenosis at C4-5 and some narrowing at C3-4. R. 324, 378. Ringering reported that she had been busy rehabbing her new home. Dr. Sohn stated that this

activity could be causing her discomfort.  Ringering reported that she was sleeping fairly well.  R. 324.

On examination, Ringering was tender to palpitations of the left neck and shoulder girdle.  She had pain with flexion, right rotation, and bilateral side bending.  Her upper extremity strength was intact.  She had some weakness in her fingers.  She had some decreased light touch sensitivity in her right thumb and first and second finger.  Dr. Sohn administered a T1-2 interlaminar epidural injection.  Ringering was also taking Norco for pain. R. 324-25.

On March 3, 2011, the Administrative Law Judge (ALJ) conducted a hearing on Ringering's application for Disability Benefits.  Ringering appeared in person and with her counsel.  Vocational Expert J. Stephen Dolan also appeared and testified.

Ringering testified first.  She testified about her work history.  She worked for car dealerships as a fleet lease rental manager, office worker, and office manager.  She also worked at a convenience gas station as a cashier.  She last worked in 2007 at Wal-Mart.  She mixed paint and worked in the paint and furniture department.  She stopped working on December 26, 2007.  R. 48, 57.  Ringering testified that she quit or walked off most of the jobs she had because of stress or difficulty dealing with

people.  R. 45-48.  She testified that she quit her last job because of, "The stress between the manager that was there that was in my department and the people that you have to deal with."  R. 48.

The ALJ asked Ringering, "So what I need to know is what stresses you out?  You can give me examples of what it is on a job that stresses you out?"  R. 48.  Ringering responded,

> Dealing with people, being around crowds of people, managers that talk down to me, bring in the public.  With the last job it was the deadlines, I shouldn't say the last job, when I worked for Mitsubishi it was the deadlines, trying to get everything in on time I just – I couldn't deal with it.

R. 48.

On questioning from her attorney, Ringering described her symptoms from her bipolar disorder.  She testified that she was depressed about five days a week for about a three-week cycle.  She testified that she would then cycle into a manic period.  R. 48-49.  During her depressed days, she would not do anything:  she would not get out of bed, would not shower, would not cook, and would not take care of her children.  R. 50.

Ringering testified that she had problems with concentration and memory.  She testified she stopped cooking even on days when she was not depressed because she would leave pots on the stove and forget about them.  R. 50-51.  She testified that she would forget "day-to-day tasks."

R. 51.  She testified that, for example, she forgot to go to her son's play. She testified, "I have a hard time remembering anything.  Even sometimes when I write it down I still forget to check the calendar to see what I have to do."  R. 51.

Ringering testified that during her manic phases, "I spend money that we don't have."  R. 51.  She testified that they filed bankruptcy and lost their home because of her spending.  She testified that her husband took her check book and debit card so she could not spend money.  She also testified that she would start projects like cleaning part of the house, but never finish them.  R. 52.

Ringering testified that her bipolar disorder had gotten worse over time.  She testified that her medications helped, but caused side effects. She testified that the medication made her drowsy, caused slurred speech, and affected her concentration and focus.  R. 53.

Ringering also testified about her back and neck problems.  She testified that her problems started when she was shot with a Taser in 2008. R. 54.  She testified that she underwent surgery and was being treated for pain management.  R. 54.  She testified that she could not lift her left arm. She testified that she had no upper strength in her arms.  She testified that she did not carry anything with her left arm.  She also testified that she had

very little feeling in three fingers of her left hand. She testified that she had

troubles with fine motor skills such as buttoning and picking up small

objects. She also had problems twisting, bending, pushing, and pulling.

R. 56. She testified that she did not do any vacuuming at home. She

testified that her son carried groceries at the store for her. She had trouble

reaching objects on high shelves at grocery stores. R. 56-57.

The ALJ asked Ringering for anything else that he needed to know.

Ringering responded, "Just the general concentration, I have trouble

concentrating a lot, focusing, completing tasks, day-to-day hygiene. I don't

– I can't remember." R. 58.

The vocational expert Dolan then testified. The ALJ asked Dolan the

following hypothetical question:

> Let's assume a younger individual under the age of 50, 12th
> grade education, past work history that's documented. Assume
> this hypothetical person can do light work, which would be
> lifting and carrying 20 pounds occasionally, 10 pounds
> frequently; standing and walking a total of 6 hours in 8; sitting a
> total of 6 hours in 8. This person would need to change
> position for a minute or two every hour; no overhead tasks.
> This might be redundant but no overhead reaching with the
> non-dominant left arm. All of these postural should be
> occasional: balancing, stooping, kneeling, crouching, crawling
> and climbing ramps and stairs would all be occasional; no
> ladders, ropes or scaffolds. And then mentally, simple routine
> tasks that can be performed independently that involve working
> primarily with things not people; interaction with coworkers and
> supervisors should be superficial, meaning no negotiation,
> arbitration, mediation, confrontation of others, supervision of

others; and, no direct interaction with the general public.  So, are there any occupations that such a person could do?

R. 60.  Dolan responded:

> Yes, Your Honor, there are jobs that would meet those restrictions.  Examples would be housekeeping, cleaner jobs, about 54,000 in the state of Illinois, which is where the claimant lives, Your Honor.  Other examples would be hand packer jobs at the light level, 20,000.  And unskilled security guard jobs, about 15,000.

R. 60.  Dolan testified that the different hand packer jobs could require working at the more strenuous medium level, but he limited his opinion to the number of such jobs at the light range described in the hypothetical question.  Dolan also testified that some security guard jobs are semi-skilled.   He limited his opinion to the number of such jobs that were unskilled and unarmed.  R. 61.

Dolan testified that people working the listed jobs would generally be allowed a thirty-minute meal break and two fifteen-minute breaks during the work day.  Dolan testified that a person could be absent from work two days a month at the most.  Dolan testified that if the hypothetical person was limited to occasional handling of objects with the left hand, the person could not perform the hand packer job, but could perform the cleaning and unskilled security guard jobs.  R. 62.  If the person was limited to occasional handling and occasional fingering with the left hand, the

cleaning job would also be eliminated and the number of available security jobs would be reduced by half.  R. 62-63.

The ALJ then concluded the hearing.

## THE DECISION OF THE ALJ

On May 20, 2011, the ALJ issued her decision.  R. 27-36.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of her age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of a Listing.  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant cannot return to her prior work, then Step 5 requires a determination of

whether the claimant is disabled considering her RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f). The claimant has the burden of presenting evidence and proving the issues on the first four steps. The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy. Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005); Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ found that Ringering met her burden at Steps 1 and 2. She had not engaged in substantial activity from December 26, 2007, until the last date that Ringering met insured status to be eligible for Disability Benefits, March 31, 2009. Ringering suffered from severe impairments of degenerative disc disease, bipolar disorder, PTSD, and alcohol abuse. R. 29.

At Step 3, the ALJ found that Ringering did not meet any Listing. The ALJ considered the Listing for Affective Disorders, § 12.04. The ALJ found that Ringering had only mild restrictions on her activities of daily living; moderate difficulties in social functioning; and moderate limitations on concentration, and no limitations on persistence or pace. The ALJ further

found that Ringering experienced one or two episodes of decompensation. R. 30. The ALJ found that this was not sufficient to meet the Listing. R. 30-31.

The ALJ gave little weight to Dr. Datta's March 4, 2010, opinion that Ringering met Listing 12.04. The ALJ noted that Dr. Datta indicated that Ringering had two symptoms of a depressive syndrome, psychomotor retardation and difficulty concentrating or thinking; however, Listing § 12.04 requires that the person have at least four of the listed symptoms. Listing § 12.04(A). The ALJ further found that Dr. Datta was not trained in the use of the ratings of "mild," "moderate," and "marked" ratings to evaluate the effect on mental conditions on functional categories. The ALJ also found that Dr. Datta's ratings were not supported by evidence in the record. R. 34.

The ALJ also found that Ringering did not meet Listing § 1.04, for Disorders of the spine, such as degenerative disc disease.

At Step 4, the ALJ found that Ringering had the RFC to perform light work subject to the following limitations: she could lift or carry 20 pounds occasionally and 10 pounds frequently; she could stand or walk 6 hours in an 8 hour workday, but needed to change positions for a minute or two every hour; she could occasionally balance, stoop, kneel, crouch, crawl,

and climb stairs and ramps; she could not climb ladders or scaffolds; she could not perform overhead tasks and overhead reaching with her left arm; and she could only perform simple, routine tasks which involved working primarily with things rather than with people and that would be performed independently with no more than superficial interaction with coworkers and supervisors, and with no contact with the general public. R. 31.

The ALJ relied on Ringering's medical records in making this RFC determination. After reviewing the mental health records, the ALJ concluded,

> Even though the claimant has had multiple mental health admissions, including an outpatient program that lasted only two months, evaluation of the evidence shows these admissions were for short periods and that they were voluntary presentations, mostly precipitated by situational stressors. There is no evidence, on this record, that the claimant's mental health care providers caused her to be psychiatrically admitted or that her symptoms and treatment lasted for 12 months or more, which would substantiate the claimant's mental health symptoms being as severe as alleged before her date lasted (sic) insured.

R. 33. The ALJ also gave some weight to the opinions of Drs. Hill and DiFonso. The ALJ gave little weight to Dr. Datta's March 4, 2010, opinion as discussed above.

The ALJ also considered the treatment notes of Drs. Curylo and Sohn in establishing Ringering's RFC. The ALJ particularly noted that Dr. Sohn

repeatedly found that Ringering's upper extremity strength was normal, and repeatedly told Ringering to remain active with her usual activities, to avoid bed rest, and to continue her exercises. The ALJ also noted that Dr. Sohn never limited Ringering's activities. R. 34.

The ALJ determined at Step 4 that Ringering could not perform her past relevant work because she dealt with the public in her prior work. R. 35.

At Step 5, the ALJ found that Ringering could perform a significant number of jobs that exist in the national economy. The ALJ considered Ringering's RFC, age, education, and work experience in conjunction with the Medical-Vocational Guidelines 20 C.F.R. Part 404, Subpart P, Appendix 2, and the opinion of vocational expert Dolan that a person with Ringering's age, education, work experience, and RFC could perform the jobs of housekeeper, hand packer, and security guard. R. 36. The ALJ then concluded that Ringering was not disabled from December 26, 2007 through the date last insured, March 31, 2009. R. 36.

## PROCEEDINGS BEFORE THE APPEALS COUNCIL

On July 7, 2011, Ringering appealed the decision of the ALJ. R. 22. On September 12, 2012, the Appeals Council denied her request for review. R. 18. On September 18, 2012, Ringering asked for permission to

submit additional material.  R. 16.  On October 18, 2012, the Appeals Council allowed Ringering to submit additional material.  The Appeals Council stated, "Any more evidence must be new *and* material to the issues considered in the hearing decision dated September 12, 2012."  R. 6 (emphasis in the original).

On November 8, 2012, Ringering submitted three additional opinions of her physicians.  R. 193-94.  Ringering submitted a form entitled "Medical Assessment of Ability to do Work-Related Activities (Mental)" completed by Dr. Datta dated August  22, 2011.  Dr. Datta opined that Ringering had poor use of judgment, poor ability to deal with work stress, poor ability to function independently, and poor ability to maintain attention and concentration.  Dr. Datta also opined that Ringering had poor ability to understand, remember, and carry out job instructions due to problems with concentration and memory.  Dr. Datta opined that Ringering had poor or no ability to behave in an emotionally stable manner, to relate predictably in social situations, and to demonstrate reliability.  R. 379-81.

Ringering submitted a questionnaire completed by Dr. Malik dated August 22, 2011.  In response to the questionnaire, Dr. Malik opined that Ringering suffered from bipolar disorder and depression.  Dr. Malik assessed a current GAF score of 45-50.  Dr. Malik opined that Ringering

had poor memory, sleep disturbance, mood disturbance, emotional liability, recurrent panic attacks, generalized persistent anxiety, decreased energy, social withdrawal or isolation and other symptoms. He opined that she had marked difficulties in maintaining social functioning and concentration, persistence or pace. R. 382-83. Dr. Malik stated that her first contact with Ringering was in February 2011. R. 382.

Ringering submitted a questionnaire completed by Dr. Sohn dated October 31, 2011. In response to the questionnaire, Dr. Sohn opined that Ringering suffered from chronic neck pain post C5-C7 fusion with stenosis and myofacial pain. He opined that she suffered from several symptoms, including fatigue, pain, poor coordination, balance problems, headaches, spasms and/or muscle tension, weakness of the left extremity, cognitive deficits and impaired sleep. Dr. Sohn opined that Ringering could sit for 2 hours in an 8 hour workday; stand for less than 2 hours in an 8 hour workday; and rarely lift less than 10 pounds and never lift 10 pounds or more. Dr. Sohn opined that Ringering would need to shift positions at will and would need to take breaks hourly, each lasting 20 to 30 minutes. Dr. Sohn opined that Ringering was limited in her ability to reach in all directions and could handle items only rarely. R. 384-85.

On December 7, 2012, the Appeals Counsel acknowledged receipt of the additional opinions of Drs. Datta, Malik, and Sohn. R. 4. The Appeals Council also denied Ringering's request for review on December 7, 2012. R. 1. The decision of the ALJ then became the final decision of the Commissioner. R. 1. Ringering then filed this action for judicial review.

<u>ANALYSIS</u>

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence. In making this review, the Court considers the evidence that was before the ALJ. <u>Wolfe v. Shalala</u>, 997 F.2d 321, 322 n.3 (7th Cir. 1993). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment. <u>Delgado v. Bowen</u>, 782 F.2d 79, 82 (7th Cir. 1986). This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record. <u>Elder v. Astrue</u>, 529 F.3d 408, 413-14 (7th Cir. 2008). The ALJ must articulate at least minimally his analysis of all relevant evidence. <u>Herron v. Shalala</u>, 19 F.3d 329, 333 (7th Cir. 1994).

The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

In this case, the ALJ's decision is supported by substantial evidence. The ALJ's determination at Step 3 that Ringering did not meet a Listing 12.04 for affective disorders such as bipolar disorder and depression is supported by substantial evidence.  To meet Listing 12.04, the claimant must have a recognized condition, such as depression or anxiety disorder. The claimant's condition must initially meet one of three categories:

1.   Depressive syndrome characterized by at least four of the following:

    a.  Anhedonia or pervasive loss of interest in almost all activities; or

    b. Appetite disturbance with change in weight; or

    c. Sleep disturbance; or

    d. Psychomotor agitation or retardation; or

    e. Decreased energy; or

    f. Feelings of guilt or worthlessness; or

    g. Difficulty concentrating or thinking; or

    h. Thoughts of suicide; or

    i. Hallucinations, delusions, or paranoid thinking;

2. Manic syndrome characterized by at least three of the following:

    a. Hyperactivity; or

    b. Pressure of speech; or

    c. Flight of ideas; or

    d. Inflated self-esteem; or

    e. Decreased need for sleep; or

    f. Easy distractibility; or

    g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

    h. Hallucinations, delusions or paranoid thinking;

    or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

Listing 12.04(A)(1). This is referred to as the Paragraph A requirement. In addition, the claimant must meet the requirements of either Paragraph B or Paragraph C of these Listings.

Paragraph B requires the claimant's mental condition to result in two of four effects:

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

Listing 12.04(B).

Paragraph C requires a medical history of severe functional

limitations as follows:

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Listing 12.04(C); Listing 12.06(C).

The decision that Ringering did not meet this Listing is supported by

the opinions of Drs. Hill and DiFonso. Both found insufficient evidence to

indicate that Ringering's condition met any Listing. The ALJ's

determination is also supported by the treatment notes of Drs. Nigam and Datta. The notes do not reveal a condition that meets the severity of effects described in paragraphs B or C.

The ALJ's decision to give little weight to Dr. Datta's March 4, 2010, opinion is also supported by substantial evidence. An opinion of a treating physician regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); SSR 96-2P. Dr. Datta opined that Ringering met Listing 12.04, but also opined that Ringering only met two of the symptoms required under Paragraph A(1) for a major Depressive disorder. Paragraph A(1) requires that the person exhibit at least four of those symptoms. Dr. Datta did not opine that Ringering met the other two alternative requirements of either Paragraph A(2) or A(3). Dr. Datta further opined that Ringering had one or two episodes of decompensation. Listing 12.04 (B) requires that a person must have had at least three episodes of decompensation within a year to meet this requirement. Listing 12,00(C)(4). Dr. Datta's opinion also was inconsistent with at least some of his treatment notes, Dr. Nigam's treatment notes, and the opinions of

Drs. Hill and DiFonso.  These inconsistencies provide substantial evidence to support the ALJ's decision to give Dr. Datta's opinion little weight.  The ALJ did not err in his handling of Dr. Datta's March 4, 2010, opinion.

The ALJ's determination of Ringering's RFC is also supported by substantial evidence.  The ALJ determined that Ringering could perform a limited range of light work.  Dr. Sohn's records support this finding. Dr. Sohn found consistently that Ringering's upper extremity strength was intact.  Dr. Sohn further repeatedly told Ringering to remain active and to continue her normal activities.  In addition, no doctor imposed a weight limitation or other limitation on Ringering's physical activities.  The ALJ also limited Ringering's use of her left arm and hand in the RFC determination. This was consistent with the medical records and Ringering's testimony. The limitation to simple repetitive tasks away from the public and with only limited contact with co-workers and supervisors was also consistent with Ringering's testimony.  She identified her major problems at her prior work were dealing with the public and with supervisors, and also working under the pressure of deadlines.  The ALJ's restriction of Ringering's RFC to these activities was supported by her testimony.

The ALJ's determination at Step 4 that Ringering could not perform her prior work was supported by substantial evidence.  The ALJ found that

Ringering could not perform her prior work because the work involved dealing with the public. That was supported by Ringering's testimony.

The ALJ's determination at Step 5-that Ringering could perform a significant number of jobs in the national economy was supported by the testimony of vocational expert Dolan. Dolan testified that a person of Ringering's age, education, experience, and RFC could perform several jobs in the national economy, including 54,000 cleaning jobs, 20,000 light hand packing jobs, and 15,000 unskilled security guard jobs in Illinois. This evidence provides substantial evidence to support the decision. See Lee v. Sullivan, 988 F.2d 789, 793 (7th Cir. 1993) (1,400 available jobs were a significant number of jobs in the national economy); accord Fast v. Barnhart, 397 F.3d 468, 472 (7th Cir. 2005 (declining to overrule Lee).

Ringering argues that the ALJ erred in failing to give Dr. Datta's March 4, 2010, opinion controlling weight. As explained above, substantial evidence supported the ALJ's decision that Dr. Datta's opinion was not entitled to controlling weight. Dr. Datta's opinion was internally inconsistent, and inconsistent with other evidence in the record. The Court sees no error in this decision.

Ringering argues that the ALJ erred in failing to give controlling weight to the August 22, 2011, opinion of Drs. Datta and Malik, and the

October 31, 2011, opinion of Dr. Sohn.  These opinions were issued after the ALJ issued his opinion.  The Court can only consider evidence that was before the ALJ when, as here, the Appeals Council denied the request for review.  <u>Wolf v. Shalala</u>, 997 F.2d 321, 323 n.3 (7th Cir. 1993).  These two opinions are irrelevant to determining whether the ALJ erred.

The 2011 opinions of Drs. Datta, Malik and Sohn would only be relevant in this case if Ringering was asking for a remand to consider new evidence under sentence six of § 405(g).  42 U.S.C. § 405(g); <u>see</u> <u>Perkins v. Chater</u>, 107 F.3d 1290, 1295 (7th Cir. 1997).  Ringering has not asked for such relief.  Furthermore, to receive such relief, Ringering must demonstrate that the opinions constitute newly discovered evidence that was not available to Ringering by the time of the administrative proceeding. <u>Id.</u> Long before the administrative proceeding concluded, Ringering knew that Drs. Datta, Malik and Sohn had examined her and formed opinions. Ringering could have secured their opinions in a timely fashion.  These opinions are not newly discovered evidence.  <u>See</u> <u>e.g.</u>, <u>Sample v. Shalala</u>, 999 F.2d 1138, 1144 (7th Cir. 1993).

To secure a § 405(g) sentence six remand, the newly discovered evidence must also be material, "'[M]ateriality' means that there is a

"reasonable probability' that the Commissioner would have reached a different conclusion had the evidence been considered . . . ."  <u>Perkins v. Chater</u>, 107 F.3d at 1295.  Dr. Malik stated that she first examined Ringering in February 2011.  Ringering's eligibility for Disability Benefits expired on March 31, 2009.  It is unclear that a reasonable probability exists that Dr. Malik's opinion based on observations that occurred almost two years later would change the ALJ's decision.  Ringering has failed to demonstrate any basis for relief based on the 2011 opinions of Drs. Datta, Malik and Sohn that were not before the ALJ.

WHEREFORE, THIS COURT RECOMMENDS that Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 18) should be ALLOWED, and Plaintiff Julia Ringering's Motion for Summary Reversal (d/e 14) should be DENIED.  The decision of the Defendant Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  <u>See</u> <u>Video</u>

Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local

Rule 72.2.


    ENTER:  November 19, 2014


                     *s/ Tom. Schanzle-Haskins*
                     UNITED STATES MAGISTRATE JUDGE